ARMED SERVICES BOARD OF CONTRACT APPEALS

| | |
|---|---|
| Appeals of - | ) |
| | ) |
| Parsons Government Services, Inc. | ) ASBCA Nos. 62269, 62270, 62425 |
| | ) 62426, 62680, 62974 |
| Under Contract No. W912DY-09-D-0062 *et al.* | ) |

APPEARANCES FOR THE APPELLANT:          Michael R. Rizzo, Esq.
                                        Aaron S. Ralph, Esq.
                                          Pillsbury Winthrop Shaw Pittman LLP
                                          Los Angeles, CA

APPEARANCES FOR THE GOVERNMENT:          Samuel W. Morris, Esq.
                                          DCMA Chief Trial Attorney
                                        Srikanti Schaffner, Esq.
                                          Trial Attorney
                                          Defense Contract Management Agency
                                          Carson, CA

OPINION BY ADMINISTRATIVE JUDGE MCLISH

Parsons Government Services, Inc. (Parsons) appealed six contracting officer's final decisions issued by the Defense Contract Management Agency (DCMA or government). Five of the final decisions disallowed certain lease costs and unilaterally established final indirect rates for fiscal years (FY) 2014-2018; one denied Parsons' certified claim requesting that the contracting officer issue a final decision finding that the lease costs for FY 2014-2017 were allowable.[1] The parties' dispute is over how the amount of allowable lease costs is calculated following the sale and leaseback of a depreciable asset, in this case Parsons' headquarters building.

The parties have elected to proceed solely upon the record submitted, pursuant to Board Rule 11. The assigned Board judge heard oral argument on October 8, 2024. Only entitlement is under review. We deny the appeals.

---

[1] Parsons previously pursued similar claims for FY 2011-2013, which were also the subject of unilateral rate determinations, certified claims and appeals to the Board. Without reaching the merits, the Board ruled that the FY 2011 claim was barred by the statute of limitations and failed to assert a valid CDA claim. *See Parsons Gov't Servs., Inc.*, ASBCA No. 62113, 20-1 BCA ¶ 37,586 at 182,507 (Apr. 15, 2020). Parsons thereafter withdrew its claims for FY 2012 and 2013 (R4, tab 15 at 425-26).

FINDINGS OF FACT (FOF)

I.    **Background**

1.  Parsons is a wholly owned subsidiary of Parsons Corporation (PC), with its headquarters located in Pasadena, California (joint stipulation of material facts (stip.) ¶ 1; first amended compl. ¶ 1).  Parsons and various government entities are parties to a number of contracts which are subject to the Contract Disputes Act of 1978, 41 U.S.C. ¶¶ 7101-7109 (CDA) and assigned for contract administration purposes to DCMA.  This includes Contract No. W912DY-09-D-0062 (contract), which the U.S. Army Corps of Engineers awarded to Parsons on September 17, 2009.  (Stip. ¶ 3; R4, tab 1 at 1[2])  The contract provided for work to be ordered via task orders, some of which would be fixed-price and some flexibly priced (R4, tab 1 at 2, 4-23, 66-67).

2.  For flexibly priced task orders, the government would make payments in accordance with FAR 52.216-7, ALLOWABLE COST AND PAYMENT (DEC 2002).  Under that clause, the contracting agency is required to make payments to the contractor "in amounts determined to be allowable by the Contracting Officer in accordance with [FAR] subpart 31.2 in effect on the date of this contract and the terms of this contract."  (Stip. ¶ 4; R4, tab 1 at 66-67, 84-85)

3.  The dispute in these appeals concerns the allowability of rental costs paid by Parsons following its sale and leaseback of the Pasadena Tower Building (Building), located in Pasadena, California.

4. Parsons initially owned the Building, having constructed it between 1973 and 1974 at a cost of approximately $19 million.  Parsons began depreciating the Building in August 1974, and it was fully depreciated by December 1991.  Parsons also made improvements to the Building over the years, which cost approximately $13.5 million.  The government partially reimbursed the costs of depreciation for the Building and the improvements through payments to Parsons under its government contracts.  *See* FAR 31.205-11, DEPRECIATION.  (Stip. ¶¶ 7-9; app. reply br., ex. B, Decl. of N. Cotton (Cotton Decl.), attach. 1 at 3)

---

[2] The parties numbered pages in their Rule 4 submissions with a prefix of letters and leading zeros.  We have dropped the prefix and leading zeros and cite only the numeric page number.

2

5.  In 1991, the parties executed an advance agreement in accordance with FAR 31.109 and 31.205-11.  The advance agreement provided that Parsons would include, "as a component of the overhead cost, a use charge of $754,201 per year" for the Building (stip. ¶¶ 10, 12).  That use charge was to continue from 1992 to 2011 without increase.  In addition to the use charge, Parsons incurred costs for commercial property insurance, personal property taxes and real estate taxes.  Parsons charged the government separately for those costs and the government paid for them.  (Stip. ¶¶ 13-14)

## II.  Sale and Leaseback Arrangement

6.  In May 2011, Parsons sold the Building, along with other facilities on its headquarters campus, to a third party for $319.9 million.  The parties to the transaction allocated approximately $149.3 million of the sale price to the Building.  (Stip. ¶ 16)

7.  The improvements to the Building were not fully depreciated when it was sold.  The Building had a net book value (the difference between the acquisition cost and the accumulated depreciation, as discussed below) of approximately $4.2 million at that time (stip. ¶ 15).

8.  Shortly thereafter, Parsons leased back the Building for a 15-year term.  The monthly rent began at $752,000 and increased to $993,000 per month by the end of the lease term.  Under the lease, Parsons' parent corporation PC was required to pay separately for insurance, taxes, maintenance, storage, and other facilities charges.  In 2012, the first full year of the leaseback arrangement, Parsons incurred approximately $14.4 million in lease and other facility costs, which it allocated to its business units.  (Stip. ¶¶ 16-18)

9.  The sale of the Building triggered the application of FAR 31.205-16, GAINS AND LOSSES ON DISPOSITION OR IMPAIRMENT OF DEPRECIABLE PROPERTY OR OTHER CAPITAL ASSETS.  As discussed in more detail below, that cost principle requires, upon the sale of a tangible asset, the calculation of a "gain" or "loss" from the sale that is then credited or charged to the government.  *Id.* at (c).  Gains or losses are "the difference between the net amount realized . . . and its undepreciated balance."  Gains, however, are capped at the difference between the acquisition cost of the asset and its undepreciated balance.  *Id.* at (c), (d).

3

10. Pursuant to -16[3], Parsons' sale of the Building resulted in a gain that was credited to the government. The difference between the net amount realized from the sale ($149.3 million) and the undepreciated balance of the Building on the date Parsons became a lessee ($4.2 million) was $145.1 million (R4, tab 18 at 926). Pursuant to -16(d), the recognized gain was limited to the difference between the acquisition cost of the Building ($19.1 million to construct + $13.5 million in improvements = $32.6 million) and its undepreciated balance ($4.2 million). Accordingly, the net gain was approximately $28.4 million. (Cotton Decl, attach. 1 at 3; R4, tab 15 at 755-58). This resulted in the government recapturing approximately $17 million in depreciation payments previously made to Parsons (the remainder of the gain was allocated to other entities under PC) (Cotton Decl. at ¶ 7 and attach. 2).

11. Having sold the Building and become a lessee, Parsons' ability to recover from the government its costs of leasing the Building were now governed by the cost principle at FAR 31.205-36, RENTAL COSTS. Under that cost principle, reasonable rental costs are generally allowable, but special rules govern where the rental costs are incurred pursuant to a sale and leaseback arrangement. Specifically,

> [r]ental costs under a sale and leaseback arrangement [are allowable] only up to the amount the contractor would be allowed if the contractor retained title, computed based on the net book value of the asset on the date the contractor becomes a lessee of the property adjusted for any gain or loss recognized in accordance with 31.205-16(b).

FAR 31.205-36(b)(2); (stip. ¶¶ 20, 22)

12. Subsection (b) of FAR 31.205-16 provides that, in the case of a sale and leaseback, gains and losses are calculated as "the difference between the net amount realized and the undepreciated balance of the asset on the date the contractor becomes a lessee." *Id*. at (b)(1). It then prescribes limitations on losses. *Id*. at (b)(2).

13. The allowability of Parsons' lease costs following the sale was addressed in the final indirect cost rate proposals (FICRPs) that it submitted annually to DCMA. By March 2018, Parsons had submitted FICRPs for FY 2014-2016.[4] In each of those

---

[3] For convenience and readability, we at times refer to FAR 31.205-36 as "-36", FAR 31.205-16 as "-16" and FAR 31.205-11 as "-11".

[4] Parsons had also submitted FIRCPs for FY 2011-13. Those years are not at issue here. *See* note 1 above.

proposals, Parsons claimed that approximately $2.2 million of its annual lease costs for the Building were allowable. As prescribed in -36(b)(2), it calculated this amount by adjusting the $4.2 million net book value by the $28.4 million gain (*see* FOF ¶ 10) and spreading that amount over the 15-year term of the lease:

| Net Book Value (a) | $4.2 million |
|---|---|
| Gain from Sale (b) | $28.4 million |
| Total Allowable Lease Cost (c = a + b) | $32.6 million |
| Annual Allowable Lease Costs (15 years) (c/15) | $2.2 million |

(Stip. ¶¶ 23, 32; R4, tab 15 at 757)

14. Parsons took a new position as to the allowability of its rental costs during discussions with DCMA regarding its FY 2011 FICRP (stip. ¶¶ 24-25). In a letter to the Corporate Administrative Contracting Officer (CACO), Parsons argued that far more of its annual lease costs for the Building were allowable than it had proposed (R4, tab 8). Parsons' new position as to the allowable rental costs for the Building was based on its interpretation of revisions to -36(b)(2)[5] and -16 that had been made in 2005. Parsons contended that the cap on gains provided in -16(d) did not apply when calculating the allowable rental lease costs under -36(b)(2). (*Id.* at 330-34) According to Parsons, $9.7 million of its annual lease costs were allowable, rather than the $2.2 million it had proposed (*id.* at 332). This new amount was calculated by determining the gain pursuant to -16(b) (*i.e.,* the difference between the net amount Parsons realized from the sale of the Building and the undepreciated balance), without reference to -16(d). This would make the gain $145.1 million. Parsons deemed that amount to be the total allowable lease cost under -36(b)(2), which equated to $9.67 million per year over 15 years. (*Id.;* first amended compl. ¶ 117)

---

[5] Parsons actually referred to FAR 31.205-11(h)(1), which addresses capital leases rather than FAR 31.205-36(b)(2), which deals with operating leases. As Parsons noted, the provisions are identical (R4, tab 8 at 328 n.1). In their briefing here, both parties reference FAR 31.205-36(b)(2) as the applicable provision and therefore we treat it as such.

5

15. DCMA disagreed with Parsons' new position. It maintained that -16(d) applied and capped the recognized gain at the difference between the acquisition cost and the undepreciated balance. (Stip. ¶ 27; R4. tab 18 at 925-26, tab 19 at 937-39)

16. When Parsons submitted its FY 2017 FIRCP, as with its FIRCPs for 2011-2016, it did not include in that proposal the full amount of rental costs for the Building that its earlier letter to the CACO argued were allowable (stip. ¶¶ 32-34).

III.  **Unilateral Rate Determinations for FY 2014-2017 (ASBCA Nos. 62269, 62270, 62425 and 62426)**

17. The CACO issued final decisions unilaterally establishing final indirect rates for FY 2014-2017 based upon Parsons' FICRPs for each of those fiscal years and each year's associated DCAA audit reports. The final decisions did not accept Parsons' contention that $9.67 million of its annual lease costs were allowable, rather than the $2.17 million it had originally proposed. (Stip. ¶¶ 29-30, 33-34; R4, tabs 6-7, 13-14) In November 2019 and March 2020, Parsons timely appealed these determinations to the Board (stip. ¶¶ 31, 35).

IV.  **Parsons' Certified Claim – ASBCA No. 62680**

18. Parsons filed a certified claim with the CACO seeking an upward adjustment of leaseback costs incurred during FY 2014-2017 and a decision that the lease costs at issue in these appeals were allowable. Parsons asserted that for those years, it was entitled to a total increase in corporate allocations of adjusted leaseback costs of $12,912,324. (Stip. ¶ 36; R4, tab 15 at 420) A new CACO responded via email stating that "[t]he prior CACO issued the [final decisions] for these years without allowing Parsons to adjust for leaseback rental cost. Therefore, Parsons is not allowed to submit a certified claim for additional adjustments after issuance of the [final decisions]. All prior Final Decisions remain final." (Stip. ¶ 37; R4, tab 16 at 887) Parsons interpreted that email as a final decision and timely appealed it to the Board (stip. ¶ 38).

V.  **FY 2018 Unilateral Rate Determination – ASBCA No. 62974**

19. In August 2019, Parsons submitted its FIRCP for FY 2018 (stip. ¶ 39). Unlike the FIRCPs submitted for FY 2014-2017, Parsons included the amount of lease costs that it had been contending since March 2018 were allowable – *i.e.*, the difference between the net amount realized from the sale of the Building and its undepreciated balance. Parsons reported a total realized gain of $145,046,186 for the Building and lease improvements. (*Id.*)

6

20. DCAA's audit report on the FY 2018 FIRCP stated:

> We identified that [Parsons] changed its method for computing allowable annual lease. When [Parsons] had the sales leaseback arrangement effective FY 2011, it calculated $2,172,667 in allowable annual lease using ***recognized gain*** (acquisition cost less undepreciated balance). However, in [its] FY 2018 incurred cost submission, [Parsons] revised its calculation to use ***realized gain*** (sale price less undepreciated balance) resulting in $9,669,746 in allowable annual lease [costs], a significant increase from the FY11 through FY17 proposed amount.
>
> . . . .
>
> FAR 31.205-36(b)(2) limited the rental costs under a sale and leaseback arrangement up to the amount the contractor would be allowed if it retained title, computed based on the net book value adjusted for gain or loss recognized in accordance with 31.205-16(b). We considered both FAR 31.205-16(b) and FAR 31.205-16(d) together when computing the allowable lease under the sale and leaseback arrangement as FAR 31.205-16(d) is specifically for contract costing purposes and limited the recognized gain to the difference between the acquisition cost and the undepreciated balance. These FAR provisions collectively ensure that the recovery of allowable lease [costs] does not exceed amounts that would have been allowed had the contractor retained title to the asset.

(R4, tab 18 at 925-26) (emphasis in original)

21. By letter dated April 8, 2021, the CACO issued a unilateral rate determination finding that $1,786,234 of Parsons' facility costs in its FY 2018 FIRCP were unallowable. The CACO found that Parsons overstated the allowable annual lease costs because it used realized gain instead of recognized gain to calculate the allowable amount:

7

In FY 2011, Parsons sold Pasadena Tower building and leased it back. Parsons initially calculated the allowable leaseback cost based on the recognized gain, which was the difference between the total Pasadena Tower acquisition cost and the undepreciated net book value on lease date. However, in FY 2018, Parsons revised its allowable leaseback cost calculation based on the net amount realized from the sale according to their interpretation of FAR 31.205-36(b)(2).

(R4, tab 19 at 937) The CACO found that "the difference between the 'recognized gain' and the 'realized gain,'" based upon the Building's sales price, was unallowable (*id.* at 938). Parsons timely appealed this determination to the Board (stip. ¶ 41).

DECISION

I.    **Standard of Review**

Board Rule 11 permits the parties "to waive a hearing and to submit [their] case upon the record." Rule 11 allows the Board to make "findings of fact on disputed facts" where it is appropriate to our resolution of these appeals. *Reed Int'l, Inc.*, ASBCA No. 61451 *et al.*, 20-1 BCA ¶ 37,587 at 182,513 (citations omitted).

Under FAR Part 31, costs incurred in connection with the performance of a cost reimbursement contract are allowable if they are reasonable, allocable, and comply with CAS (if applicable) or with generally accepted accounting principles and practices appropriate to the circumstances, the terms of the contract, and any limitations set forth in FAR Subpart 31.2. *See* FAR 31.201-2(a)(1)-(5); *Fiber Materials, Inc.*, ASBCA No. 53616, 07-1 BCA ¶ 33,563 at 166,251. Unilateral rate determinations are government claims. *See Allard Nazarian Grp, Inc. dba Granite State Mfg.*, ASBCA Nos. 62413, 62414, 23-1 BCA ¶ 38,408 at 186,622 (citing *Northrop Grumman Corp.*, ASBCA No. 62165, 21-1 BCA ¶ 37,922 at 184,170). If a cost is allocable to a contract and reasonable, the government bears the burden to demonstrate that the cost is unallowable due to a contract provision, statute or regulation. *Fiber Materials* at 1166,252 (citing *Lockheed Martin Western Development Laboratories*, ASBCA No. 51452, 02-1 BCA ¶ 31,803 at 157,102). *See also Technology Sys., Inc.*, ASBCA No. 59577, 17-1 BCA ¶ 36,631 at 178,389;

8

*Johnson Controls World Servs., Inc.*, ASBCA No. 46674, 96-2 BCA ¶ 28,464 at 142,166.[6]

## II.     The Parties' Contentions

The parties' dispute is over the proper interpretation of FAR 31.205-36(b)(2), which, as described above, addresses the allowability of rental costs incurred by a contractor following a sale and leaseback of a depreciable asset.  FAR 31.205-36(b)(2) limits allowable rental costs to "the amount the contractor would be allowed if the contractor retained title," and goes on to state that the amount is to be "computed based on the net book value of the asset on the date the contractor becomes a lessee of the property adjusted for any gain or loss recognized in accordance with 31.205-16(b)."  Both parties contend that this provision is clear and unambiguous.

DCMA contends that, although -36(b)(2) specifically references -16(b), the limitation on gains for contract costing purposes set forth in -16(d) also applies when determining the proper adjustment to net book value called for by -36(b)(2).  Thus, if the gain as calculated under -16(b) ("the difference between the net amount realized and the undepreciated balance . . .") exceeds the cap imposed by -16(d) (limiting gain to "the difference between the acquisition cost . . . of the asset and its undepreciated balance"), then the gain is also so limited for purposes of -36(b)(2).  (Gov't br. at 13-20)  DCMA argues that this reading ensures compliance with the "primary instruction" of -36(b)(2) that the rental costs are allowable "only up to the amount the contractor would be allowed if [it] retained title" (*id.* at 16-17 (quoting FAR 31.205-36(b)(2)).  DCMA also contends that its interpretation gives proper meaning to the term "recognize[]" as used in both -36(b)(2) and -16(d) (*id.* at 15-18).  DCMA also finds support for its interpretation in the regulatory history describing the purpose of amendments to -16 and -36(b)(2) made in 2005 (*id.* at 20-27).

Parsons contends that the limitation on gains contained in -16(d) does not apply when assessing the gain for purposes of -36(b)(2).  Parsons argues that -36(b)(2) "specifically calls for 'adjustment' of the allowable costs to be measured in accordance

---

[6] Here, there is no dispute as to allocability.  The government argues that, even if Parsons' interpretation of the applicable cost principles is correct, its claimed costs are unreasonable.  Because of how we resolve the interpretation issue, we need not reach the government's reasonableness argument.  For purposes of our analysis of the regulatory scheme, we assume, without deciding, that the costs are reasonable.

with 31.205-16(b), which, in turn, clearly calls for the measurement to be *based upon the realized gain of the sale.*" (App. br. at 12-13) (emphasis in original)  In its view, because -36(b)(2) contains no reference to -16(d), that provision is not part of the adjustment called for in -36(b)(2) (app. br. at 13; app. reply at 6).  Therefore, the "gain" referred to in -36(b)(2) is "the difference between the net amount realized and the undepreciated balance" as provided by -16(b)(1), regardless of whether that amount exceeds the cap on gains imposed by -16(d).  Parsons contends that the 2005 amendment to -36(b)(2) meant that -36(b)(2) "no longer limited allowable leaseback rental costs to 'the amount the contractor would be allowed if the contractor retained title'" (app. br. at 8).  Parsons argues that, while there is no need to resort to the regulatory history because the language is unambiguous, the regulatory history supports its interpretation.  It further argues that, if the language is ambiguous, it should be construed against the government under the rule of *contra proferentum (id.* at 16-18).

## III.     Regulatory Interpretation

Our resolution of these appeals turns on the proper interpretation of FAR 31.205-36(b)(2).   The rules governing regulatory interpretation are largely the same as those used to interpret statutes.  *Lengerich v. Dep't of Interior*, 454 F.3d 1367, 1370 (Fed. Cir. 2006); *Tesoro Hawaii Corp. v. United States*, 405 F.3d 1339, 1346-47 (Fed. Cir. 2005); *Pub. Warehousing Co., K.S.C.*, ASBCA No. 59020, 16-1 ¶ 36,366 at 177,269 (citing *Lengerich*).  We are to ascertain the regulation's plain meaning. *Lengerich*, 454 F.3d at 1370.

Our analysis begins by examining "the text of the regulation as a whole, reconciling the section in question with sections related to it."  *Id.*  We seek an interpretation that is "harmonious with the regulatory scheme," meaning we "look not only to particular language but to [the] design of the provision as a whole."  *Garco Constr., Inc.*, ASBCA Nos. 57796, 57888, 15-1 BCA ¶ 36,135 at 176,380 (citing *Space Gateway Support*, LLC, ASBCA Nos. 55608, 55658, 13 BCA ¶ 35,232 at 172,979).  We must therefore "read the disputed language in the context of the entire regulation as well as other related regulatory sections in order to determine the language's plain meaning."  *Vazquez-Claudio v. Shinseki*, 713 F.3d 112, 115 (Fed. Cir. 2013) (citing *Lengerich*, 454 F.3d at 1370).  *See also Reflectone, Inc. v. Dalton,* 60 F.3d 1572, 1577-78 (Fed. Cir. 1995) (*en banc*) (proper regulatory interpretation "examines and reconciles the text of the entire regulation, not simply isolated sentences."); *SWR, Inc.*, ASBCA No. 56708, 15-1 BCA ¶ 35,832 at 175,222 (plain meaning rule requires reading language "in the context of the entire clause, as well as other related regulatory sections . . . .") (citing *Vazquez-Claudio,* 713 F.3d at 115).

These appeals present an issue of first impression. We addressed predecessor versions of -36(b)(2) in *LTV Aerospace Corp.*, ASBCA No. 17130, 76-1 BCA ¶ 11,840 at 56,626 (concluding that the contractor had not engaged in "a sale and leaseback of the nature intended to limit cost allow-ability to those of ownership."), and *Talley Def. Sys., Inc.*, ASBCA No. 39878, 93-1 BCA ¶ 25,521 at 127,158 (concluding that the contractor had engaged in a sale and leaseback and that the government correctly limited recovery of subsequent rental costs to "the costs of ownership."). The primary issue in those appeals was whether a sale and leaseback had occurred. Here, there is no such dispute. In addition, the regulations at issue in *LTV* and *Talley* did not contain the language added to -36(b)(2) in 2005 describing the appropriate computation, or anything similar. Nor did they cross-reference -16; indeed, the current -16(b) referenced in -36(b)(2) did not exist until 2005. And, unlike the situation presented here, both *Talley* and *LTV* involved assets for which the government had paid no depreciation (*see LTV*, 76-1 BCA at 56,621 (finding 29) and *Talley*, 93-1 BCA at 127,157) and thus those decisions did not address a key aspect of the dispute before us now. Accordingly, *LTV* and *Talley* provide little guidance to us here.

## IV.    The Regulatory Scheme

We begin by examining the relevant regulatory scheme as a whole. The parties' dispute here is centered on the allowability of a contractor's rental costs incurred on a building that it has sold and then leased back from the new owner. To understand how the regulatory scheme operates in that context, we must examine the interplay of three cost principles found in FAR 31.205: -11, DEPRECIATION; -16, GAINS AND LOSSES ON DISPOSITION OR IMPAIRMENT OF DEPRECIABLE PROPERTY OR OTHER CAPITAL ASSETS; and -36, RENTAL COSTS.

We find it helpful to consider first how the regulatory scheme works when a contractor simply sells a depreciable asset, such as a building, before moving on to address the sale and leaseback scenario that is at issue here.

### A.  Sale of a Depreciable Asset With No Leaseback

#### 1.  Depreciation

When a contractor sells a depreciable asset like a building, the asset's depreciation history has an important impact on the accounting treatment of the sale. Therefore, the first aspect of the regulatory scheme we address is depreciation, which is governed by the cost principle at FAR 31.205-11.

11

When a contractor owns property that it uses to perform government contracts, a portion of the depreciation of the property is considered a cost to the contractor. The allocable portion of such depreciation costs are allowable as provided in -11. "Depreciation is a method of distributing the cost of a tangible capital asset over its useful life." Manos, Government Contract Costs & Pricing, § 18.2 (citing FAR 2.101, definition of depreciation). For an asset like a building, the depreciation is calculated based on the acquisition cost of the building, spread out over the building's expected useful life. *Id*. As the government reimburses the contractor's depreciation costs over time, the amount of depreciation remaining declines. The remainder is called the undepreciated balance, also known as net book value.[7]

A key concept is that when the property is fully depreciated and the government has paid the contractor all of its depreciation costs, the contractor can no longer charge the government for the cost of using the property, unless the parties agree on a use charge:

> No depreciation or rental is allowed on property fully depreciated by the contractor…. However, a reasonable charge for using fully depreciated property may be agreed upon and allowed (but see 31.109(h)(2)). In determining the charge, consideration shall be given to cost, total estimated useful life at the time of negotiations, effect of any increased maintenance charges or decreased efficiency due to age, and the amount of depreciation previously charged to Government contracts or subcontracts.

FAR 31.205-11(f). Thus, once it has covered the depreciation costs, the government gets the benefit of the contractor's continued use of the property at no additional use cost, unless it chooses to enter into an agreement to pay a use charge. *See Union Boiler Works, Inc. v. Sec'y of the Army,* 156 F.3d 1374, 1376 (Fed. Cir. 1998).

---

[7] The parties agree that the net book value of an asset is the difference between the acquisition cost and the accumulated depreciation, also referred to as the undepreciated balance. Gov't br. at 16; R4, tab 8 at G329. *See Lockheed Martin Corp.*, ASBCA No. 54169, 07-2 BCA ¶ 33,702 at 166,862 (equating net book value and undepreciated balance).

## *2. Gains and Losses on Sales*

If the contractor sells a depreciating asset, such as the Building at issue here, FAR 31.205-16 comes into play.[8]  Under that cost principle, the sale may result in an

---

[8] In pertinent part, FAR 31.205-16 provides:

> (a) Gains and losses from the sale, retirement, or other disposition (but see 31.205-19) of depreciable property shall be included in the year in which they occur as credits or charges to the cost grouping(s) in which the depreciation or amortization applicable to those assets was included (but see paragraph (f) of this subsection).  However, no gain or loss shall be recognized as a result of the transfer of assets in a business combination (see 31.205-52).
> (b) Notwithstanding the provisions in paragraph (c) of this subsection, when costs of depreciable property are subject to the sale and leaseback limitations in 31.205-11(h)(1) or 31.205-36(b)(2) –
> (1) The gain or loss is the difference between the net amount realized and the undepreciated balance of the asset on the date the contractor becomes a lessee; and
> (2) When the application of (b)(1) of this subsection results in a loss—
> (i) The allowable portion of the loss is zero if the fair market value exceeds the undepreciated balance of the asset on the date the contractor becomes a lessee; and
> (ii) The allowable portion of the loss is limited to the difference between the fair market value and the undepreciated balance of the asset on the date the contractor becomes a lessee if the fair market value is less than the undepreciated balance of the asset on the date the contractor becomes a lessee.
> (c) Gains and losses on disposition of tangible capital assets, including those acquired under capital leases (see 31.205–11(h), shall be considered as adjustment of depreciation costs previously recognized.  The gain or loss for each asset disposed of is the difference between the net amount realized, including insurance proceeds from involuntary conversions, and its undepreciated balance.

13

adjustment to the amount of depreciation costs for which the government is responsible.  The adjustment depends on whether the net amount the contractor receives from the sale exceeds the sold asset's undepreciated balance.  FAR 31.205-16(a), (c) and (d).  If the property sells for more than its undepreciated balance, the difference is deemed a "gain."  FAR 31.205-16(c).  The government is entitled to a credit in the amount of the gain up to the amount of depreciation costs it has previously paid.  *Id.*  The gain, however, is capped at the difference between the acquisition cost of the property and its undepreciated balance, which generally equals the amount of depreciation the government has previously paid.  FAR 31.205-16(d) ("The gain recognized for contract costing purposes shall be limited to the difference between the acquisition cost . . . of the asset and its undepreciated balance . . .").  Conversely, if the property sells for less than the undepreciated balance, the difference is a "loss," which the contractor charges to the government.  FAR 31.205-16(a), (c).

To begin to see how this works, consider a building that is fully depreciated.  Because the undepreciated balance (net book value) is zero, the gain is the net amount received from the sale.  Assume the contractor acquired the building for $10 million, all of which the government has reimbursed in depreciation payments.  If the contractor sells the fully depreciated building for a net of $10 million, the government is credited with that gain.  In this way, the government recaptures its previously paid depreciation costs.  If the sale is for a net of $11 million, the government's credit is still $10 million, not $11 million, because it has only made $10 million in depreciation payments.  FAR 31.205-16(d).  The contractor pockets the remaining $1 million.  If the building fetches only $3 million, the gain, and thus the government's credit, is $3 million, but it does not recapture the additional $7 million previously paid in depreciation.[9]

---

(d) The gain recognized for contract costing purposes shall be limited to the difference between the acquisition cost (or for assets acquired under a capital lease, the value at which the leased asset is capitalized) of the asset and its undepreciated balance (except see paragraphs (e)(2)(i) or (ii) of this subsection).

FAR 31.205-16(a)-(d).

[9] This and the other hypothetical scenarios discussed in this decision are for illustrative purposes only to aid in understanding the regulatory scheme as pertinent to these appeals.  Complicating factors not addressed in these examples could result in different outcomes than depicted here.

It becomes more complicated if the property is not fully depreciated when it is sold. Let's revise our scenario so that the building acquired by the contractor for $10 million has an undepreciated balance of $2 million, the government having made $8 million in depreciation payments. Now if the building sells for a net of $9 million, the gain is $7 million (net amount realized less undepreciated balance). That amount does not exceed the acquisition cost less the undepreciated balance ($8 million), so -16(d) does not come into play and the full $7 million gain is credited to the government. In this way, of the $17 million total the contractor has received for the building ($8 million in depreciation payments plus $9 million in sale proceeds), the contractor keeps $10 million. If the sale is instead for a net of $12 million, the gain would be $10 million, but for the fact that this amount exceeds the government's previous depreciation payments of $8 million, so the gain credited to the government is capped at $8 million pursuant to -16(d).

The result in each of these scenarios is that the total amount the contractor keeps in depreciation payments plus proceeds from the asset sale equals at least the amount of its acquisition costs. For its part, the government shares in the proceeds of the sale up to, but never exceeding, the amount necessary for it to recapture its depreciation payments to date.

Now revise the scenario so it involves a loss. If the building fetches a net of only $1.5 million, there is a loss of $500,000 ($1.5 million sale proceeds - $2 million undepreciated balance). The contractor recovers the $500,000 loss via a charge to the government. This ensures that the contractor is reimbursed for the full acquisition cost of the building ($8 million in prior depreciation payments + $1.5 million in sales proceeds + $.5 million charge to the government = $10 million acquisition cost), as it would have if it had kept the building.

In this regulatory scheme, then, gains on sales of depreciable property are treated as credits to the government which allow it to recapture some or all of its prior depreciation payments, while losses are charges to the government that ensure the contractor recoups the full acquisition cost.

### B. Sale and Leaseback of a Depreciable Asset

Now we consider what happens when the contractor sells property and immediately leases it back. Having sold the property, the contractor can no longer charge depreciation to the government. Its costs of using the property are now in the form of rental payments to the new owner. At this point, two questions arise: (1) how much is the government credited or charged based on the gain or loss determined

15

under -16; and (2) to what extent are the contractor's lease costs going forward allowable? Answering the first question is necessary to answer the second.

### 1. *Applying -16(b) to Determine Gain or Loss*

Subsection (b) of -16 answers the first question. As we saw above, subsection (c) describes the calculation of gains and losses that would apply to the sale of property asset without a leaseback. Subsection (b) applies, "[n]otwithstanding the provisions in paragraph (c) of this subsection, when costs of depreciable property are subject to the sale and leaseback limitations in 31.205-11(h)(l) or 31.205-36(b)(2)." Under subsection -16(b)(1), the gain or loss is the difference between the net amount realized from the sale and the undepreciated balance on the date the contractor becomes a lessee. Except for possible differences resulting from timing,[10] this should yield the same gain or loss as under subsection (c). *Compare* FAR 31.205-16(b) ("gain or loss is the difference between the net amount realized [from the sale] and the undepreciated balance of the asset on the date the contractor becomes a lessee") *with* FAR 31.205-16(c) ("The gain or loss for each asset disposed of is the difference between the net amount realized … and its undepreciated balance.").

For losses, however, subsection (b)(2) limits the allowable loss in situations where the asset sells for an amount different than its fair market value. If the property's fair market value exceeds the undepreciated balance, the allowable loss is zero. FAR 31.205-16(b)(2)(i). If the fair market value is less than the undepreciated balance, any loss is limited to the difference between the fair market value and the undepreciated balance. FAR 31.205-16(b)(2)(ii).

The parties here do not dispute that, in a sale and leaseback scenario governed by -16(b), the gain or loss calculated under subsection (b) is applied as a credit or charge to the government, just as under subsection (c). The government gets a credit for a gain in order to recapture some or all of its prior depreciation payments. The government is charged for losses so that the contractor ultimately recovers its full acquisition cost, subject to the limits on losses set forth in -16(b)(2) for sales at other than fair market value.

There is also no dispute that -16(d) applies when calculating the amount of credit the government receives upon the sale of a building that results in a gain under -

---

[10] Subsection -16(b) makes clear that the gain or loss is calculated as of the date the contractor becomes a lessee, whereas under -16(c) it is calculated at the time of the sale.

16(b)(1).  Subsection (d) caps the amount of gain that can be recognized for contract costing purposes to the difference between the acquisition cost and the undepreciated balance.  This prevents the government from being credited with more than the accumulated depreciation it has paid at the time of the sale.

That is what occurred here.  When Parsons sold the Pasadena Tower, it calculated the gain under -16(d) by calculating the difference between the acquisition costs of the Building and the undepreciated balance (*see* FOF ¶ 10).  That amount, approximately $28.4 million (of which $17 million was allocated to Parsons), was credited to the government, thereby allowing the government to recapture the depreciation payments it had made (FOF ¶ 10).  Had -16(d) instead been ignored, and the gain calculated as the difference between the net amount realized from the sale and the undepreciated balance, the government would have enjoyed a credit of $145.1 million, far more than it had paid in depreciation.  The parties agree that it was appropriate to apply -16(d) when calculating the gain and that the gain on the sale of the Building was properly determined (Cotton Decl.; tr. at 91-92).

### 2.  Applying -36(b)(2) to Determine Allowable Lease Costs

This allows us to answer the second question: how much of the lease costs that the contractor pays going forward under the leaseback arrangement may it recover from the government?  As we have seen, the allowability of rental costs is covered by -36, and subsection (b)(2) applies to sale and lease back arrangements.  To review, subsection (b)(2) provides: "[r]ental costs under a sale and leaseback arrangement [are allowable] only up to the amount the contractor would be allowed if the contractor retained title, computed based on the net book value of the asset on the date the contractor becomes a lessee of the property adjusted for any gain or loss recognized in accordance with 31.205-16(b)."

We read this provision as having two operative portions.  The first sets an upper limit on allowability, *i.e.*, "only up to" the amount the contractor would be allowed if it had retained title.  The second directs how that allowable amount is determined: "computed based on the net book value of the asset . . . adjusted for any gain or loss recognized in accordance with 31.205-16(b)."  Important to Parsons' argument is that this provision was amended in 2005 to add the language beginning with the word "computed."  *See* Federal Acquisition Regulation; Gains and Losses, 70

17

Fed. Reg. 33673 at 33676 (June 8, 2005) (publishing final rule).[11]

To begin with, we disagree with Parsons that the phrase "the amount the contractor would be allowed if the contractor retained title," was essentially no longer operative after the language beginning with the word "computed" was added in 2005. According to Parsons, the new language describes how the allowable amount is to be calculated, and that calculation should be made without regard to whether it results in an amount that equals, or even resembles, what the contractor would have received had it retained title. (App. br. at 8 ("The updated FAR 31.205-36(b)(2) no longer limited allowable leaseback rental costs to 'the amount the contractor would be allowed if the contractor retained title.'")). Parsons' interpretation functionally rewrites the regulation to read the initial phrase out of the regulation. We decline to adopt an interpretation that so fundamentally alters the cost principle's plain meaning. *See Tesoro*, 405 F.3d at 1347 (declining to read word "contractor's" into FAR clause on economic price adjustments that would have changed the clause's meaning); *Lockheed Corp. v. Widnall*, 113 F.3d 1225, 1227-28 (Fed. Cir. 1997) (in analyzing cost principle on interest and other financial costs, declining to interpret phrase "interest on borrowings" in a way that "improperly read the words 'on borrowings' out of the regulation.").

Moreover, we are not to interpret regulatory language in a way that leaves language superfluous. "It is 'a cardinal principle of statutory construction' that 'a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant.'" *ITServe All., Inc. v. United States*, 122 F.4th 1364, 1370 (Fed. Cir. 2024) (citing *TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001) (quoting *Duncan v. Walker*, 533 U.S. 167, 174 (2001)). Under Parsons' reading, the reference to the amount the contractor would have been allowed if it retained title is unnecessary – the drafters could have deleted that language and included only the computation. Because the "retain[] title" language remains in the regulation, however, we must assume it has meaning when interpreting the surrounding language. *See Boeing Co. v. Sec'y of Air Force,* 983 F.3d 1321, 1327-28 (Fed. Cir. 2020) (rejecting interpretation that would disregard the first sentence of a regulation). We must also consider the regulatory scheme as a whole. *Tesoro Hawaii*, 405 F.3d at 1347. Accordingly, we are required to interpret the phrase beginning with "computed" so that it effectuates the requirement that allowable rental costs after a sale

---

[11] At the same time -36(b)(2) was amended in 2005, -16 was amended in various ways, including the addition of subsection (b) addressing sale and leaseback arrangements, discussed above. *Id.* at 33675-76.

and leaseback are limited to the amount that would have been allowable had the contractor retained title.

Our analysis of the regulatory scheme so far has shown that, if a contractor retains title to a depreciable asset rather than selling it, it is able to (1) continue to charge the government until the asset is fully depreciated and (2) keep the depreciation payments made by the government. A sale of the property for a gain has two effects on the contractor's recovery of the costs it would have been able to recover if it retained title: (1) the contractor is no longer able to recoup the remaining undepreciated balance through depreciation charges, and (2) it must credit to the government some or all of the depreciation payments it had received to date. To put the contractor in the position it would have been had it retained title, therefore, requires effectively reversing those two effects.

With that in mind, we turn to the phrase "computed based on the net book value of the asset on the date the contractor becomes a lessee of the property adjusted for any gain or loss recognized in accordance with 31.205-16(b)." The two components of this equation (net book value and the gain/loss adjustment), correspond to the two effects caused by the sale. Including the net book value in the allowable amount of rental costs addresses the first effect by permitting the contractor to recover an amount equal to the remaining depreciation it would have been able to charge but for the sale. The gain/loss adjustment takes care of the second effect by effectively reversing the credit or charge to the government dictated by -16(b) upon an asset sale.

For example, return to our hypothetical building with a $10 million acquisition cost on which the government has paid $8 million in depreciation, leaving $2 million of undepreciated balance (the net book value). Assume the contractor sells the building for $9 million and leases it back. Pursuant to -16(b) the contractor's gain is $7 million (the net amount realized ($9 million) minus the undepreciated balance ($2 million)). Under -16, the government receives a credit for this $7 million gain and the contractor retains the remaining $1 million of depreciation payments made to date. (Note that -16(d) is not implicated because the net received from the sale is less than the acquisition cost). Had it kept the building, the contractor would have been able to (1) continue to charge deprecation to the government to recoup the remaining $2 million undepreciated balance, and (2) keep all of the $8 million in depreciation payments the government had made to date, rather than just $1 million.

Under -36(b)(2), to determine the amount of allowable rental costs that would put the contractor in the position it would have been had it retained title, we take the net book value of $2 million and add it to the $7 million gain, resulting in allowable rental costs of $9 million. Together with the $1 million in depreciation payments not

19

recaptured by the government, the $9 million in allowable rental costs puts the contractor in the same position that it would have been had it kept the building and eventually recovered the $10 million acquisition cost through depreciation charges.

What if the contractor sells the property for less than the amount it has received from the government in depreciation payments? For example, assume our hypothetical building sells for only $7 million, $1 million less than the $8 million of accumulated depreciation. Under -16, the government recaptures $5 million of the $8 million of paid depreciation ($7 million realized - $2 million undepreciated balance), and the contractor retains the remaining $3 million. (Again, -16(d) does not come into play). And again, the contractor is no longer able to charge the government for the remaining depreciation, as it could have if it had retained title. Applying -36(b)(2) to determine the amount of allowable rental cost going forward, we adjust the net book value of $2 million by the $5 million gain, resulting in $7 million in allowable rental costs. Together with the $3 million in retained depreciation payments, the contractor ultimately recovers its full $10 million acquisition cost, as it would have if it retained title.

Now consider a loss. Assume the acquisition cost is $10 million and the government has paid $6 million in depreciation, leaving a net book value of $4 million. If the building sells for a fair market value of $3 million, the contractor now has a loss of $1 million, which it charges to the government. The rental cost calculation under -36(b)(2) is $4 million net book value minus $1 million loss, resulting in allowable rental costs of $3 million. Again, this results in the contractor being able to recover up to the same $10 million it would have if it had retained title ($6 million in retained depreciation payments, plus $1 million loss charged to the government, plus $3 million in rental costs).

From this perspective, the addition of the second clause to -36(b)(2) in 2005 had a significant effect. Prior to the change, -36(b)(2) was not linked to -16 and thus did not account for the depreciation recapture scheme set out in that section. Instead, the allowable rental cost was described only as the amount the contractor would be allowed if it retained title. If read to mean that the allowable rental cost was simply the remaining undepreciated balance, the results could be skewed because of the recognition of a gain or loss under -16. If there were a gain, the contractor could be worse off than if it had retained title because the government's recapture of some or all of its prior depreciation payments would make the undepreciated balance insufficient to cover the contractor's full acquisition costs. If there were a loss, the government might be worse off than if the contractor had retained title, because its payment of the loss charge would result in the undepreciated balance being more than the amount necessary to cover the contractor's acquisition costs.

20

In this way, the 2005 amendment linking -16 to -36(b)(2) preserved the regulatory scheme's evident goals of ensuring that (1) the contractor ultimately receives no more and no less than its acquisition costs and (2) neither the government nor the contractor are worse off because of a sale and leaseback than they would have been had title been retained.

## V.      <u>Applying 31.205-36(b)(2) When Sales Proceeds Exceed Acquisition Cost</u>

At long last, we turn to the scenario presented in this case, where the net sale proceeds in a sale and leaseback scenario exceed the contractor's acquisition cost. The parties dispute how -36(b)(2) is to be applied in this scenario to determine the allowable amount of rental costs going forward.

Assume our hypothetical building with an acquisition cost of $10 million, on which the government has paid $8 million in depreciation, sells for $15 million and the contractor leases it back. Under Parsons' interpretation, the proper calculation under -36(b)(2) is to adjust the $2 million net book value by the gain described in -16(b) (the difference between the net amount realized and the undepreciated balance), while ignoring the cap on gains imposed by -16(d). The gain would be $13 million. Adjusting the net book value by that gain as prescribed by -36(b)(2), the contractor would be permitted to charge lease costs up to $15 million. This would result in the contractor ultimately receiving $5 million more than the $10 million it would have eventually recovered had it retained title. Under the government's interpretation, the gain would be capped by -16(d) at $8 million ($10 million acquisition costs - $2 million undepreciated balance), which would result in total allowable lease costs of $10 million under -36(b)(2).

The government's interpretation is correct.

### 1.  *The -16(d) Gain Limitation Applies*

First, the government's interpretation is the only reasonable reading of FAR 31.205-36(b)(2) when considered in the context of the regulatory scheme as a whole, discussed at length above. Specifically, it gives effect to -36(b)(2)'s primary admonition, which is that the allowable rental costs under a sale and leaseback arrangement are to be no more than the amount the contractor would have recovered if it had retained title. It also avoids either the contractor or the government being better or worse off than if the sale and leaseback had not occurred. Parsons' interpretation, by contrast, is irreconcilable with the regulatory scheme. In situations where, as here, the net amount realized from the sale exceeds the acquisition cost, Parsons' reading

21

results in the contractor recovering an amount that exceeds what it would have if it retained title, leaving it considerably better off than if it had retained title. Parsons' interpretation, therefore, is contrary to the regulatory scheme and unreasonable.

Second, the government's interpretation results in -16(b) being applied consistently when determining the amount of a gain from the sale of an asset and when determining the allowable amount of rental costs under a leaseback. By its terms, -16(b) describes the general method for determining the amount of gain from a sale "when costs of depreciable property are subject to the sale and leaseback limitations in . . . 31.205-36(b)(2)." However, -16(b) is not applied in isolation from the rest of -16, including -16(d), when determining the gain to be recognized for depreciation recapture purposes. As both parties agree, -16(d) applies and sets an upper limit on the amount of gain for which the government receives a credit, despite the absence of any reference to -16(d) in -16(b). Under the government's interpretation, the same logic applies when applying -16(b) for purposes of -36(b)(2): rather than apply -16(b) in isolation, it is read in conjunction with -16(d).

This interpretation also results in the word "gain" in -36(b)(2) referring to the same amount as the "gain" calculated under -16 for depreciation recapture purposes. Parsons' interpretation, in contrast, results in inconsistent applications of -16, with "gain" meaning one thing for purposes of -16 and something else for purposes of -36(b)(2). This is further cause to reject it. *See IBP, Inc. v. Alvarez,* 546 U.S. 21, 34 (2005) (noting "the normal rule of statutory interpretation that identical words used in different parts of the same statute are generally presumed to have the same meaning.") (citation omitted); *United States v. Thompson/Center Arms Co.*, 504 U.S. 505, 512 n.5 (1992) ("normal canons of construction caution us to read the statute as a whole, and, unless there is a good reason, to adopt a consistent interpretation of a term used in more than one place within a statute").

Third, the government's interpretation is consistent with the use of the word "recognized" in -36(b)(2). While the parties differ on how the terms "recognized" and "realized" should be understood in -36(b)(2) and -16(b) and (d), the key point is that -16(d) uses "recognized" when setting a limit on the amount of gain for which the government can receive a credit for contract costing purposes, while -16(b), if considered in isolation as Parsons would have us do, does not set an amount of gain to be "recognized." The fact that the adjustment called for by -36(b)(2) is "for any gain or loss *recognized* in accordance with 31.205–16(b)" (emphasis added) thus further supports the conclusion that -16(d)'s limitation on gain recognition for contract costing purposes is applicable when making the adjustment.

22

Fourth, the conclusion that -36(b)(2)'s specific reference to -16(b) does not mean that -16(d) is to be ignored is further bolstered by the opening phrase of -16(b) stating that -16(b) applies "notwithstanding the provisions in paragraph (c) of this subsection." Parsons' interpretation is that, for purposes of -36(b)(2), -16(b) should be read as if it also states that it applies "notwithstanding the provisions in in paragraph (d) of this subsection." But it does not. The explicit exclusion of -16(c) indicates that there was no intent to also exclude -16(d).

Parsons argues that the government's interpretation is wrong because, had Parsons retained title to the Building, it may have been able to recover more than the acquisition cost through an agreement with the government for a reasonable use charge pursuant to -11(f). Indeed, the government had agreed to pay a reasonable use charge from 1992-2011 (FOF ¶ 5), and it is not unreasonable to believe that the government would have made a similar agreement in the future had Parsons not sold the Building. Restricting the post-leaseback rental costs to the amount necessary for Parsons to recoup its acquisition costs, the argument goes, does not put Parsons in the same position it would have been in had it retained title and entered into an agreement on a reasonable use charge. Accordingly, Parsons contends -16(d) should not be applied, and instead the "gain" for purposes of 36(b)(2) should be the difference between the net amount realized and the undepreciated balance per -16(b).

This argument suffers from two main flaws. To begin with, it assumes that, under a hypothetical use agreement Parsons might have reached with the government had it retained title, the government would have paid Parsons the same amount Parsons realized from the sale. In effect, it assumes that a reasonable use charge would be the amount necessary for the contractor to recover an amount equal to the asset's fair market value. But -11(f) does not indicate that a reasonable use charge should be based on the fair market value. Rather, it provides that "consideration shall be given to cost, total estimated useful life at the time of negotiations, effect of any increased maintenance charges or decreased efficiency due to age, and the amount of depreciation previously charged to Government contracts or subcontracts." FAR 31.205-11(f). The use charge determined using those factors could differ considerably from the amount the contractor could recover under Parson's interpretation of -36(b)(2).

The other principal flaw in Parsons' argument is that -11(f) does not require the government to enter into use agreements and, in any event, it contemplates that the amount will be subject to negotiation based on the listed factors. Parson's interpretation, however, would result in -36(b)(2) effectively forcing the government to not only accept a use agreement that it might otherwise have declined to enter, but also accept an amount of use charge dictated solely by the sale price the contractor is able

23

to obtain, leaving the government without any ability to negotiate the amount or apply the required factors. By locking in the benefits of a favorable use agreement that might be unavailable if it retained title, this interpretation could result in the contractor having a financial incentive to engage in a sale and leaseback solely for that reason. Absent any indication in the regulatory language, structure or history that -36(b)(2) was intended to have this result, we reject Parsons' argument.

Parsons also argues that the government's interpretation is unfair to the contractor. It points out that, under that interpretation, a contractor that sells a building may be significantly worse off leasing the building back than if it moves to a different facility. If it moves, its allowable rental costs will not be limited by -36(b)(2). This, however, is a result of policy decisions made by the drafters of the FAR, evidently intended to reduce the possibility of sale and leaseback arrangements being misused. It is not within the Board's power to reverse such policy decisions. *See Artuz v. Bennett*, 531 U.S. 4, 10 (2000) ("Whatever merits these and other policy arguments may have, it is not the province of this Court to rewrite the statute to accommodate them. We hold as we do because respondent's view seems to us the only permissible interpretation of the text."); *Boeing,* 983 F.3d at 1331 (citing *Artuz,* 531 U.S. at 10).

We hold that, when the language of -36(b)(2) is construed in the context of the regulatory scheme as a whole, the meaning is clear and unambiguous. The only reasonable interpretation is that, when adjusting an asset's net book value "for any gain or loss recognized in accordance with FAR 31.205-16(b)," -16(d) applies as a cap on the amount of gain that may be recognized.

### 2. *The Regulatory History Supports Applying -16(d) When Determining Allowable Lease Costs*

The regulatory history of -16 and -36(b)(2) supports our conclusion that FAR 31.205-16(d) applies when determining the gain "recognized in accordance with 31.205-16(b)" under -36(b)(2). *See Lockheed Corp.*, 113 F.3d at 1227 (examining regulatory history of provision at issue even where its plain language was clear as to its meaning); *Exelis, Inc.*, ASBCA No. 58966, 17-1 BCA ¶ 36,708 at 178,748 (same). *See also Perry v. Martin Marietta Corp.*, 47 F.3d 1134, 1137 (Fed. Cir. 1995) (court's task in interpreting meaning of FAR provisions implementing the Cost Accounting Standards is to ascertain the CAS Board's intended meaning).

The relevant regulatory history is the commentary published in the Federal Register leading up to the amendments to -16(b) and -36(b)(2) finalized in 2005. The Civilian Agency Acquisition Council and the Defense Acquisition Regulations Council (the "Councils") originally issued proposed amendments regarding gains and

24

losses in sale and leaseback arrangements in 2003.  *See* Federal Acquisition Regulation; Gains and Losses, Maintenance and Repair Costs, and Material Costs, 68 Fed. Reg. 40466 (July 3, 2003).  Following consideration of public comment, they revised those proposed rules in 2004.  Federal Acquisition Regulation; Gains and Losses, 69 Fed. Reg. 29380 (May 21, 2004).  Following further public comments, the Councils issued the final rule on June 8, 2005.  *See* Federal Acquisition Regulation; Gains and Losses. 70 Fed. Reg. 33673 (June 8, 2005).

The regulatory history confirms our conclusion above that Parsons is incorrect in contending that, after the 2005 amendments, -36(b)(2) "no longer limited allowable leaseback rental costs to 'the amount the contractor would be allowed if the contractor retained title'" (app. br. at 8).  To the contrary, the commentary provided by the Councils that adopted the amendment repeatedly confirms that the intent was to preserve that long-standing limitation.

The Councils explicitly rejected the recommendation of two commenters "to permit the contractor to recover the lease payments that result from the sale and leaseback arrangement."  69 Fed. Reg. at 29381.  The Councils reiterated that the original limitation would still apply:

> [A]llowable lease costs relating to a sale and leaseback arrangement have long been limited in the cost principles to what the contractor would have received had they retained title.  The basic tenet that underlies this provision is that a contractor should not benefit for entering into a sale and leaseback arrangement.  The Councils believe this basic tenet continues to be appropriate.  It is important to note that a sale and leaseback arrangement is a voluntary financing mechanism entered into by the contractor.  The Councils do not believe the contractor should be entitled to recover additional monies simply because of a paper transaction that provides no significant benefit to the Government.

*Id.  See also* 68 Fed. Reg. at 40466 ("the Government should reimburse the contractor the same amount for the subject asset as if the contractor had retained title . . . ."); 69 Fed. Reg. at 29381 (soliciting input from interested parties "based on the assumption that the FAR will specify a disposition date and will continue to limit future lease costs to the costs of ownership."); 70 Fed. Reg. at 33673 (June 8, 2005) (publishing final rule and noting that "[i]n addition, revised language is also added to recognize that an adjustment to the lease/rental cost limitations [is] required to ensure

25

that the total costs associated with the use of the subject assets do not exceed the constructive costs of ownership.").

When adopting the final rule in 2005, the Councils addressed a commenter's suggestion that "the sale and leaseback transaction should . . . [e]ither apply the depreciation recapture at the time of sale, or limit the lease cost for the period of time necessary to liquidate an amount equal to the depreciation recapture."  70 Fed. Reg. at 33674.  The Councils disagreed with this recommendation, emphasizing what had been stated in the 2004 proposed revisions: that "the FAR 'will continue to limit future lease costs to the costs of ownership.'"  *Id.*  Nevertheless, the Councils acknowledged that language needed to be added to -36(b)(2) to ensure that both parties' interests were protected:

> The intent of this longstanding limitation in the cost principles is that, for Government contract costing purposes, the contractor should not benefit, nor should the contractor be harmed, for entering into a sale and leaseback agreement, and that the recovery of costs should be limited to the normal cost of ownership.  As the respondent has noted, under the current proposed rule, the recognition of a gain may limit the contractor in its ability to recoup what would otherwise be considered allowable costs up to the original acquisition cost.  Likewise, the recognition of a loss may have the opposite effect that being the Government would actually reimburse the contractor for costs in excess of the original acquisition cost.  As a result, the limitation at . . . FAR 31.205-36(b)(2) has been modified to reflect these concerns.

*Id.*  This confirms our observation above that the effect of the added language was to ensure that the recovery of costs would continue to be limited to those that would be allowable had the contractor retained title (*i.e.*, the costs of ownership) and neither the government nor the contractor would be worse off because of a sale and leaseback than they would have been had title been retained.  *Id.*

Nothing in the regulatory history suggests that the amendment to -36(b)(2) was intended to accomplish the drastic change that Parsons argues that it did.  Parsons' view that the amendment was intended to correct an inequity flowing from restricting the allowable rental costs to those the contractor would have been allowed had it retained title finds no support at all in the Councils' commentary.  There is no discussion of allowing a contractor who sold and leased back an asset to now charge

26

rental costs up to the amount it obtained for the asset in the sale, rather than the amount necessary to ensure that it recouped its original acquisition costs as had long been the approach. Had the Councils intended to so dramatically change the amount of allowable lease costs that a contractor could potentially recover following a sale and leaseback, presumably they would have mentioned it. To the contrary, the regulatory history indicates that the intent, with respect to gains, was to ensure that the contractor would retain the "ability to recoup what would otherwise be considered allowable costs *up to the original acquisition cost*." 70 Fed. Reg. at 33674 (emphasis added).

Finally, the regulatory history of the simultaneous changes made to -16 supports our conclusion that -16(d) applies when determining the gain for purposes of -36(b)(2). Prior to the 2005 amendments, the language that is now in -16(d) —which limits gains to the acquisition cost minus the undepreciated balance—was in the paragraph that was then -16(b). When the Councils proposed a new -16(b) that would apply to sales and leasebacks, they redesignated what was then -16(b), including the limitation on gains, as -16(c). The new -16(b) began with "[n]othwithstanding the language in paragraph (c) of this subsection..." A commenter pointed out that this exclusion of -16(c) appeared to mean that, when calculating a gain under the new -16(b), the limitation on gains in -16(c) would not apply, and thus "could [be] interpreted to entitle the Government to recover more than the amount of depreciation that has been taken." *See* 69 Fed. Reg. at 29381.

The Councils responded:

> This was not the intent of the proposed language. Paragraph (b) includes the statement 'Notwithstanding the language in paragraph (c) of this subsection....' Paragraph (c) is currently where the limitation exists. The Councils have therefore revised the language in paragraph (c), and added a new paragraph (d) to eliminate this concern. *The language on the limitation is now contained in paragraph (d), which applies to all asset dispositions, including sale and leaseback arrangements.*

*Id.* (emphasis added). This clearly stated intent that -16(d) applies to determinations of gains under both -16(b) and -16(c) confirms our conclusion that -16(b) is not to be read in isolation, but rather in conjunction with -16(d). This undermines Parsons' insistence that the "gain . . . recognized in accordance with 31.205-16(b)" under -36(b)(2) is to be determined without reference to the limitation for contract costing purposed provided in -16(d). Rather, the regulatory history establishes that applying the limitation -16(d) is "in accordance" with -16(b).

27

DCMA's determination of Parsons' allowable rental costs following the sale and leaseback of the Building accords with our interpretation of -36(b)(2) and the related cost principles. In calculating the "net book value of the asset … adjusted for any gain or loss recognized in accordance with 31.205-16(b)," the contracting officer was correct to apply -16(d) and thus cap the recognized gain at the difference between Parsons' acquisition cost of the Building and the undepreciated balance at the time of the sale and leaseback (FOF ¶¶ 15-19). Parsons' contention that the contracting officer was required to disregard -16(d) when determining the gain for purposes of -36(b)(2) and allow rental costs equal to the difference between the net amount realized from the sale of the Building and the undepreciated balance is without merit.

DCMA has met its burden of proving that it properly applied FAR 31.205-36(b)(2) in determining the allowability of Parson's rental costs following its sale and leaseback of the Pasadena Tower Building. The appeals are denied.

Dated: March 26, 2025

THOMAS P. MCLISH
Administrative Judge
Armed Services Board
of Contract Appeals

I concur

OWEN C. WILSON
Administrative Judge
Acting Chairman
Armed Services Board
of Contract Appeals

I concur

MICHAEL N. O'CONNELL
Administrative Judge
Vice Chairman
Armed Services Board
of Contract Appeals

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA Nos. 62269, 62270, 62425, 62426, 62680, 62974, Appeals of Parsons Government Services, Inc., rendered in conformance with the Board's Charter.

Dated:  March 26, 2025

PAULLA K. GATES-LEWIS
Recorder, Armed Services
Board of Contract Appeals